William E. RICKETTS Plaintiff,

v.

Kenneth S. APFEL,[1] Commissioner of Social Security, Defendant.

No. CIV.A. 96–K–1667.

United States District Court, D. Colorado.

Aug. 14, 1998.

---

1. Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296, 108 Stat. 1464 (1994), the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security effective March 31, 1995. In accordance with § 106(d) of that law, Kenneth S. Apfel, Commissioner of Social Security, is substituted for Donna E. Shalala, Secretary of Health and Human Services, as the Defendant in this action. (Donna E. Shalala replaced Shirley S. Chater as Secretary of Health and Human Services.) Accordingly, the Defendant in this case should now be reflected as "KENNETH S. APFEL, Commissioner of Social Security."

Frederick W. Newall, Colorado Springs, CO, for Plaintiff.

John A. Sbarbaro, Stephen D. Taylor, United States Attorney's Office, Yvette G. Keesee, Assistant Regional Counsel, Denver, CO, for Defendant.

## MEMORANDUM DECISION ON APPEAL

KANE, Senior District Judge.

### I. *INTRODUCTION*

Claimant William Earl Ricketts injured his shoulder on January 16, 1990 while working as a truck driver. His first claim for Social Security disability benefits and his 1993 reconsideration claim were denied. A hearing was held before an administrative law judge ("ALJ") on September 14, 1994 in Fort Worth, Texas. The ALJ denied the claim and on May 7, 1996, the Appeals Council denied a request for review of the decision. Ricketts now decision.

I have reviewed the record in detail and conclude the ALJ did not have substantial

evidence upon which to base his decision. The decision is reversed.

## II. *FACTUAL BACKGROUND*

William (Bill) Ricketts was employed as a truck driver on January 16, 1990. On that day, while unloading a truck, Ricketts was using his left arm to pull a skid loaded with four 55–gallon drums of liquid soap. He slipped and fell on a wet spot, causing the entire weight of his body to pull on the arm. As Ricketts described the incident, it felt as if his arm came out of the socket, twisted, and went back in. He saw Dr. Jack Thomas on the same day for pain radiating from the shoulder to the elbow.

Ricketts received cortisone shots and was placed on light duty at work for two weeks. He was allowed to drive, but had to be accompanied by another individual who handled all lifting and carrying. On January 30 or 31, 1990, Dr. Thomas ordered Ricketts off work completely until further notice. Initial treatment with anti-inflammatory medication and physical therapy was unsuccessful. Dr. Thomas subsequently performed a total left shoulder reconstruction on April 12, 1990 after diagnosing an anterior impingement syndrome with rotator cuff injury in the shoulder. (R. at 138, 147.)

Dr. Thomas' medical records indicate that Ricketts did "very well" following surgery, without post-surgery discomfort. (R. at 137.) Physical therapy occurred three times per week. (R. at 137.) However, by May 14, 1990, Dr. Thomas' records show some atrophy of the deltoid muscle area. (R. at 136.) Although Dr. Thomas instructed Ricketts to continue gentle range of motion exercises, the doctor also specified, "[h]e is not to use [the arm] for any type of active pushing, pulling or lifting at this time." (*Id.*) A month later, on June 11, 1990, Dr. Thomas reported mild swelling with pain in the deltoid and some crepitation. (*Id.*) Dr. Thomas injected the area with Marcaine and Depomedrol, instructing Ricketts to continue his physical

therapy. (*Id.*) Dr. Thomas' medical records suggest the swelling and pain decreased with use of a muscle stimulator and physical therapy, but numbness and tingling in the arm caused him to refer Ricketts to Dr. Don Patman, a vascular surgeon, on October 8, 1990. (R. at 135, 161.)

Drs. Thomas and Patman were concerned about a possible thoracic outlet syndrome.[2] (R. at 134–35.) On December 18, 1990, Dr. Patman performed a second surgery on Ricketts to alleviate his loss of circulation. (R. at 160.) The rib resection resulted in removal of the left first rib, but within the following months, Dr. Patman's records noted Ricketts complained of the same sort of problem he had had previously and a "trigger area." (R. at 159–60.) Physical therapy was reinstituted three times per week. (R. at 158.) Ricketts was given another Marcaine and Decadron injection and was referred to Dr. Richard Williamson. (R. at 158–59.)

Dr. Williamson reported that Ricketts complained of arm and hand pain with pressure in the elbow. (R at 191.) This physician also noted muscle atrophy of the involved shoulder. (R. at 192.) Dr. Williamson continued Ricketts' anti-inflammatory medications and physical therapy for strengthening and range of motion exercises. (R. at 188.) On May 21, 1991, Dr. Williamson stated Ricketts' prognosis was guarded but his compliance had been excellent and he anticipated Ricketts would return to limited type work in approximately one month. (R. at 188–89.) By July 8, 1991, however, Dr. Williamson had conducted an EMG and an MRI which revealed nerve entrapment of the elbow. (R. at 184.) The doctor again projected that Ricketts would return to work in approximately one month and again ordered physical therapy. (*Id.*) In the following month, however, Dr. Williamson did not authorize Ricketts to return to work but instead re-

---

**2.** Thoracic outlet syndrome is the "compression of the brachial plexus nerve trunks, characterized by pain in arms, paresthesia of fingers, vasomotor symptoms ...,· and weakness and wasting of small muscles of the hand; it may be caused by drooping shoulder girdle, a cervical rib or fibrous band, an abnormal first rib, continual hyperabduction of the arm, or (rarely) compression of the edge of scalenus anterior muscle." *Dorland's Illustrated Medical Dictionary* 1527 (25th ed.1974).

ferred him to Dr. Peter Polatin because of his continuing pain and headaches. (R. at 181.)

Dr. Polatin first saw Ricketts on August 21, 1991. At that time, Ricketts' chief complaints were "neck pain with associated headaches, left shoulder pain, and low back pain, longstanding but increased lately." (R. at 194.) Dr. Polatin's records enumerated Ricketts' complaints:

> His pain is made worse by all physical activity and reduced by reclining and medication. He lifts up to 30 pounds but uses his right arm and has curtailed driving, walking, physical exercise or yard work, reclining 10 hours a day.... He admits to a sleep, appetite, and libido disturbance and increased irritability.

(R. at 194.) Dr. Polatin concluded Ricketts was "chronically disabled," requiring a comprehensive rehabilitation approach. (R. at 195.) Dr. Polatin accordingly referred Ricketts to the P.R.I.D.E.[3] program in Dallas, and said, "In the interim, he remains temporarily totally disabled." (*Id.*) Ricketts was unable to participate in the program as P.R.I.D.E. was denied by his medical insurance company (unspecified) for lack of benefit from other therapies. (R. at 217.)

In 1992, Ricketts saw Dr. Harold Urschel, who referred him to Drs. Margarita Solis and Gary Tunell. (R. at 198, 204.) Ricketts told Dr. Solis the strength in his left upper extremity was the same or worsening in spite of all the treatments. (R. at 198.) Dr. Solis also observed changes in the skin on Ricketts' left hand and hyper-sensitivity of the skin on the left upper anterior chest wall. (R. at 199.) Testing of the muscles in the left upper extremity revealed "interesting findings of increased irritability" and "abnormal findings" in "the upper brachial plexus muscles at the medial cord level." (*Id.*) Nerve conduction velocity studies revealed some slowing on the left side in comparison with the right. (*Id.*) Dr. Solis also observed that the left side of Ricketts' face did not

sweat as opposed to the right. (*Id.*) Ricketts testified at the hearing that this was because Dr. Patman "cut a nerve that operates the sweat glands and stuff on the left side of [the] face." (R. at 282.)

Dr. Tunell dismissed arthritis as the cause of Ricketts' left shoulder-arm pain. (R. at 204.) He attributed the pain to the left thoracic outlet and shoulder area, "since his clinical symptoms still suggest[ed] entrapment at that location." (R. at 205.) Dr. Tunell also explained the nerve to the deltoid muscle was cut in the first surgery in January, 1990, "which left his left arm hanging [a few inches] lower than his right and the result ... steady headaches which are not relieved by medication." (R. at 163–64.)

On March 20, 1992, Dr. Urschel performed a second rib resection because the rib had regenerated and loss of circulation had reoccurred. (R. at 170–71, 204.) The pre– and postoperative diagnosis was "recurrent left thoracic outlet syndrome, resistant to physiotherapy and reflex sympathetic dystrophy."[4] (R. at 170.)

This third surgery, however, did not resolve the problem. On April 8, 1993, Dr. Jonathan Walker wrote a letter of medical necessity to request a gunslinger shoulder orthosis, which read in part: "He suffers from reflex sympathetic dystrophy, rotation cuff tear, and post-operative crush injury to lateral cord of the brachial plexus *and* the axillary nerve .... Mr. Ricketts no longer has use of his left shoulder and as a result is in need of a shoulder support." (R. at 126.) Dr. Walker instructed Ricketts to wear the shoulder support brace for fifty to sixty percent of the day, and prohibited all activity which involved movement of the left arm and shoulder. (R. at 92.) He also instructed Ricketts to rest as needed for his headaches and to engage in only sedentary activities. (*Id.*)

---

**3.** The record refers to P.R.I.D.E. as a rehabilitative physical therapy program but fails to define the acronym. (R. at 195, 217.)

**4.** Reflex sympathetic dystrophy is a disturbance of the sympathetic nervous system marked by

pallor or rubor, pain, sweating, edema, or skin atrophy following sprain, fracture or injury to nerves or blood vessels *Dorland's Illustrated Medical Dictionary* 488 (25th ed.1974).

In an undated letter to Dr. Walker, attorney Lester W. Vance asked whether Ricketts was able to function adequately as a worker to get and keep regular employment. (R. at 131.) Dr. Walker opined that Ricketts was unable to do so. (*Id.*) When asked the length of time Dr. Walker felt future medical treatment would be needed by Ricketts for the recovery of his injuries, Dr. Walker answered forty years. (*Id.*)

Dr. Juan J. Capello saw Ricketts on October 7, 1993. His notes indicated "[s]itting and standing are the worst positions for pain and lying down and using his brace are the best." (R. at 262.) Dr. Capello described Ricketts as "thin and deconditioned," with muscle atrophy due to surgery and disuse. (R. at 262–63.) He additionally noted muscle spasms in the left side of his neck. (R. at 262.)

Dr. James Evans, a licensed clinical psychologist, saw Ricketts in January, 1994. (R. at 232.) Dr. Evans diagnosed Ricketts as moderately to severely depressed, although he denied suicidal tendencies at that time. (*Id.*) Ricketts admitted to "some homicidal ideation in the past," but had no plan and had not acted on those thoughts. (*Id.*) Dr. Evans was particularly concerned about Ricketts' depression and sleep problems. (*Id.*) He observed:

Obviously, he is in a great deal of pain. He sweats profusely as we talk and both he and his wife point out to me that he sweats only on the right side of his body and not on the left side of his upper extremity, nor his face or neck. . . . He is not taking any controlled substances and prefers not to do so. Bill and his wife do not have a list of medications he has been on in the past, but I can imagine that those have been fairly complete.

(R. at 233.) In fact, his medications included: Advil (R. at 118, 197, 210, 229, 233), Ansaid (R. at 140), aspirin (R. at 161), Carisoprodol (R. at 118), Dalmane (R. at 259), Decadron injections (R. at 159), Depomedrol injections (R. at 136, 139, 140, 217), Demerol (following surgery)(R. at 147), Diazepam (R. at 244), Marcaine injections (R. at 136, 139, 140, 159), Motrin (R. at 195), Naprosyn (R. at 189), Parafon Forte (R. at 118, 159), Prozac Rubrison (R. at 159, 244), Sinequan (R. at 195, 210), Skelaxin (R. at 205), Soma (R. at 259), Talwin (R. at 145), Tegretol (R. at 118, 159), Vicodin (R. at 159, 175, 180, 183, 185, 189, 194), and Zylocaine (R. at 160). In 1995, Ricketts also received shots of Bupivacaine and four stellate ganglion blocks for his pain. (R. at 265–70.) Ricketts is allergic to Codeine. (R. at 130, 149, 161, 194, 229.)

Dr. Evans recommended a hospital-based pain management and rehabilitation program—Triumph Over Pain ("TOP")—at the Rehabilitation Hospital of Colorado Springs, under the management of Dr. John Tyler. (R. at 233.) According to Dr. Evans, both Ricketts and his wife "were quite eager to pursue that approach." (*Id.*) On January 11, 1994, Ricketts gave Dr. Evans permission to communicate with Dr. Urschel and his insurance carrier regarding TOP. (R. at 234.) In the meantime, Ricketts saw Dr. Wallace K. Larson to reconfirm that there were no remaining surgical options. (R. at 242.) Dr. Larson concluded:

At this time I can not think of anything additional that can be done to salvage this shoulder. He has had three surgical procedures and essentially has almost a useless left arm. I think that realistically he will need to look for work involving the use of his right arm and will have severe permanent impairment to his left arm and shoulder. I would not recommend an additional surgery.

(*Id.*)

Dr. Evans pursued the TOP alternative and noted on January 26, 1994 that the pain program staff considered Ricketts an excellent candidate. (R. at 235.) He also noted Ricketts and his wife were "very positive about the pain program." (*Id.*) A line in Dr. Evans' records from that date stated that he would "await authorization from the carrier." (*Id.*)

On February 7, 1994, Dr. Evans saw Ricketts again and wrote, "I think he is quite anxious to get authorization to get into the hospital. I called the hospital, but was not able to talk with Ms. Hayes or Leann. I will try to follow through to make sure that everything is going smoothly in getting authori-

zation." (R. at 236.) Another reference to the need for insurance authorization was made on February 21, 1994. (R. at 238.)

Notes on May 12 and May 24, 1994 reflect Dr. Evans' suggestion that Ricketts consult a physician for sleep medication. (R. at 238–39.) However, the May 24 notation also stated Ricketts could not afford to do so. (R. at 239.) In the next sentence, Dr. Evans said: "Again, I have encouraged him to get back to see Dr. Tyler [with TOP]. Bill was concerned about his coverage, but I think he knows that this is an option for him at this time." (*Id.*) No further notations indicate whether approval for the pain program was given by the insurance carrier.

Ricketts was admitted to the TOP program through the Rehabilitation Hospital of Colorado Springs on March 7, 1994. (R. at 214.) He had then increased the use of his brace to seventy-five to eighty percent of the time, reporting pain of seven out of ten on average, three-and-a-half out of ten at best, and nine out of ten at worst. (R. at 222, 232.) His reported symptoms included poor circulation of the left upper extremity, pain from fingertips to ear on the left, headaches, stabbing pain in his left shoulder blade, aches in his posterior shoulder, burning in his left elbow and deltoid region, pins and needles in his left arm, and burning in his pectoralis region on the left. (*Id.*) His muscle atrophy had greatly increased to a "marked wasting of the middle deltoid, upper superior trapezii, levator scapulae, with depression of the entire posterior shoulder girdle complex as compared to the right." (R. at 219.)

Ricketts also identified activities in which he felt limited as a result of chronic pain as part of the TOP interview process. (R. at 225.) The list included sitting (tolerance: ten to fifteen minutes, but sat for thirty-five minutes in the examiner's interview); standing (tolerance: ten minutes); walking (about one-quarter mile); lifting (three pounds with the left upper extremity, fifty to sixty pounds on the right); reaching (right arm only); lying down (difficult to get comfortable, pillows not helpful); driving (tolerance: thirty minutes); self-care tasks (wife helps Ricketts dress, wash himself, and wash and comb his hair); homemaking (none: wife does all except reheating food in the microwave, making a sandwich, or very occasional vacuuming). (*Id.*)

Moreover, Ricketts was unhappy with his level of inactivity and wanted to regain some mobility. (R. at 219.) In spite of a tendency to give the impression he was doing fine in a "macho" fashion, the TOP psychological examiner stated it was apparent that Ricketts was depressed. (R. at 219–20.) To cope, Ricketts isolated himself, became withdrawn, irritable, angry, distressed, and anxious. (R. at 220.) The psychological examiner described Ricketts as a straightforward man who "made it clear that he definitely want[ed] something to change." (R. at 220.) Ricketts, however, left the TOP program against the advice of the team after one day. (R. at 214.) He stated only that he would return when the weather and other conditions were better. (R. at 215.) Over a year later, on August 15, 1995, Dr. James Evans still listed Ricketts' symptoms as pain, depression, and insomnia, with Ricketts sleeping only one hour to an hour-and-a-half per night. (R. at 213.)

Dr. John Marta administered a series of stellate ganglion[5] blocks to Ricketts in July, 1995 after a referral from Dr. James Evans. (R. at 265.) Dr. Marta's medical records of July 20, 1995 mentioned Ricketts was seen three and one-half months before, when he received four left stellate ganglion blocks with a moderate degree of improvement. (*Id.*) After the third block administered in July, Ricketts reported that "occasionally he feels that the pain is much improved but overall he continues to have a significant degree of pain." (R. at 267.) Consequently, his treatment on July 27, 1995 was adjusted to accommodate his resistant pain by administering a "regional intravenous block ... with multiple drugs including Bretylium, bupivacane and dexamethasone." (R. at 268.) Ricketts was discharged with the circulation in his left arm significantly improved and the

---

**5.** "Stellate" means "star-shaped; coming out in rays or points from a center." *Webster's New World Dictionary of the American Language* 1428 (1960). "Ganglion" means "a mass of nerve cells serving as a center from which nerve impulses are transmitted." *Id.* at 596.

temperature significantly higher. (*Id.*) After further treatment on August 2, 1995, Dr. Marta decided there was no need for further blocks unless it was otherwise indicated and the attending physicians felt further blocks were necessary. (R. at 270.)

No additional medical records were provided. As of the hearing, Ricketts reported he still experienced a 15 to 25 degree temperature difference in his left arm.

### III. *STANDARD OF REVIEW*

The court's function is to examine the record and evaluate whether, as a whole, it "contains substantial evidence to support the Secretary's decision and whether the Secretary applied the correct legal standards." *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497 (10th Cir.1992) (citing *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir.1988)). Although the court cannot reweigh the evidence or substitute its judgment for that of the agency, "there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion." *Bernal,* 851 F.2d at 299 (citing *Frey v. Bowen,* 816 F.2d 508, 512 (10th Cir. 1987)).

If the ALJ's determination is overwhelmed by other evidence in the record or if only a "mere scintilla of evidence" supports the decision, it is not based upon substantial evidence. *Bernal,* 851 F.2d at 299 (citing *Turner v. Heckler,* 754 F.2d 326, 328 (10th Cir.1985)). The ALJ's decision is also subject to reversal if he or she applied the incorrect legal standard. *Bernal,* 851 F.2d at 299 (citing *Frey v. Bowen,* 816 F.2d at 512).

### IV. *ANALYSIS*

The ALJ uses a five-step process to determine disability. See *Williams v. Bowen,* 844 F.2d 748, 750–51 (10th Cir.1988)(describing the five-step process in detail). The first step determines whether the claimant is currently engaged in substantial gainful activity. *Williams,* 844 F.2d at 750. If the claimant is not engaged in substantial gainful activity, step two determines "whether the claimant has a medically severe impairment or combination of impairments." (*Id.*) (citing *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987)). If so, step three decides whether the impairment is equivalent to an impairment presumed by the Commissioner to be so severe it precludes substantial gainful activity. *Williams,* 844 F.2d at 751. If there is no presumptive disability, the claimant must show at the fourth step he is unable to perform work he has performed previously or he is not found disabled. (*Id.*)

Here, the ALJ reached the fifth step in evaluating Ricketts' claim, assuming Ricketts could not perform his past relevant work. (R. at 22.) At step five, the burden of proof shifts to the Commissioner to establish the claimant has the residual functional capacity (RFC) [6] "to perform other work in the national economy in view of his age, education, and work experience" and that "this specific type of job exists in the national economy." *Williams,* 844 F.2d at 751 (citing *Bowen v. Yuckert,* 107 S.Ct. at 2291; *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984); 20 C.F.R. §§ 404.1520(f), 416.920(f)(1986); *see also Campbell v. Bowen,* 822 F.2d at 1522; *Frey,* 816 F.2d at 512).

The ALJ determined Ricketts had not engaged in substantial gainful activity since January 16, 1990. (R. at 17.) The ALJ also concluded: "Medical evidence establishes that claimant has cervical, shoulder and arm pain which significantly limit his ability to perform basic work activities." The claimant therefore has a "severe impairment by regulatory definition." (*Id.*) He decided, however, Ricketts did not have a severe mental impairment and was not presumptively disabled. (R. at 18–19.)

At the fifth step of analysis, the ALJ found Ricketts had an RFC for light work activity, limited by his inability to use his left arm for lifting any more than three pounds or to brace things. (R. at 21.) The ALJ noted his determination must take into account Rick-

---

**6.** Residual functional capacity is "what the claimant is still functionally capable of doing on a regular and continuing basis, despite his im-pairments; the claimant's maximum sustained work capability." *Williams,* 844 F.2d at 751.

etts' subjective complaints of pain and consider "all avenues" of the medical and non-medical evidence. (R. at 21.) Nonetheless, the ALJ stated: "The contrast between claimant's allegations of pain and the medical record as well as his admitted activities leads to the conclusion that he is exaggerating the significance of his pain." (R. at 22.) The ALJ found Ricketts' testimony did not support the limitations he claimed on his ability to work because the "credible medical and other evidence do not show an underlying medical condition so severe as to be productive of symptoms that would preclude all work activity . . . ." (R. at 24.)

The ALJ's conclusion is in conflict with the findings of at least two state agency physicians. Dr. William Runkle agreed with Ricketts' physicians: "[T]he severity of the symptom(s) and its alleged effect on function is consistent. . . with the total medical and non-medical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or habits." (R. at 73.) The physician opined treating/examining source statements in the file were not significantly different from his own findings. (R. at 73.) Dr. Stavros Karabinas expressed a similar view. (R. at 51.)

The ALJ also found Ricketts had the RFC to perform work, limited by his inability to lift over 25 pounds frequently with his right arm and only three pounds with his left arm or to brace things with his left arm. (R. at 24.) The ALJ specified Ricketts had no non-exertional limitations. (*Id.*) He ultimately found Ricketts was not disabled and a significant number of jobs in the local and national economies existed which he could perform with limited use of his left arm. (*Id.*)

Ricketts asserts the ALJ's decision merits reversal or remand because of deficiencies in his treatment of the disability claim. Specifically, Ricketts claims the ALJ failed to consider the evidence or develop the record; failed to correctly assess credibility regarding his pain; failed to address findings of total disability and provided no reasoning for

this failure; erred in relying upon the vocational expert's ("VE's") testimony; failed to consider the entire period of disability; erred by using a standard of "all work activity" instead of "substantial gainful activity;" and incorrectly substituted his opinion for that of psychological professionals, deciding instead that he had no depressive symptoms, no weight loss, and had received no ongoing psychiatric treatment before 1994.

Defendant, on the other hand, contends the ALJ considered all the evidence and made a final decision supported by substantial evidence; the ALJ's credibility determination was based in part on the medical evidence and the ability to get and keep regular employment was not a medical conclusion but a legal one; and, because Ricketts did not seek medical attention until January 1994 after receiving a gunslinger shoulder orthosis [7], the orthosis apparently relieved Ricketts' pain.

Defendant further asserts the medical evidence supported the ALJ's finding that Ricketts' depression had a minimal effect on his ability to function mentally. Defendant also argues Ricketts' daily activities were consistent with the capability for limited light work, although his RFC was inconsistent with his previous work as a truck driver.

Finally, Defendant relies upon testimony from the VE in response to a hypothetical which described a person who did not have full use of his left arm but who could perform light work. Ricketts denies the hypothetical was an accurate portrayal of his limitations.

### A. *Failure to consider the evidence or develop the record*

Ricketts maintains, contrary to the ALJ's findings, the medical evidence supported his claim of disabling pain, painful headaches, and a severe mental impairment. As stated, the ALJ's decision acknowledged "[t]he medical evidence establishes that the claimant has severe cervical, shoulder and arm impairments," (R. at 23.), but concluded Ricketts did not have "an underlying medical condi-

---

7. "Orthosis" is "an orthopedic appliance or apparatus used to support, align, prevent, or correct deformities or to improve the function of

movable parts of the body." *Dorland's Illustrated Medical Dictionary* 1100 (25th ed.1974).

tion so severe ... [it] would preclude all work activity." (R. at 24).

Ricketts underwent three surgical procedures and consulted multiple physicians in attempts to alleviate his pain and restore circulation. (R. at 137, 147, 160, 170–71, 204.) Dr. Williamson gave Ricketts a "guarded" prognosis in spite of his compliance with recommended treatment and referred him to Dr. Polatin. (R. at 188–89; 181.) Dr. Polatin described Ricketts as "chronically disabled," and the TOP staff similarly reported that "now he is totally disabled" with a "very debilitating chronic pain problem," (R. at 195, 222, 214), although noting he might be able to decrease his pain and increase his ability to function if he learned to manage several psychological factors the examiner identified. (R. at 221.)

It is unclear from the record whether psychological treatment would have decreased Ricketts' pain or increased his function since nerve blocks and sympathectomies [8] failed to provide relief beyond a "minimum to moderate degree of improvement." (R. at 268)(describing resistant sympathetically medicated pain). Ricketts was diagnosed with reflex sympathetic dystrophy ("RSD") [9], which is described as "enigmatic, in ... its treatment," with "pain out of proportion to initiating trauma ...." (R. at 170.)

The TOP evaluation reported Ricketts' pain to be seven out of ten on average, three-and-a-half out of ten at best, and nine out of ten at worst. (Id.) Ricketts' reported symptoms included:

> poor circulation of left upper extremity, pain from fingertips to ear on his left, headaches on the left, stabbing pain in his left scapula, aches in his posterior shoulder, burning in his left elbow, and deltoid region, pins and needles in his left anterior arm and burning in his pectoralis region on the left.

(R. at 222.) Ricketts' constant headaches were not relieved by medication. (R. at 241, 197, 163.) Dr. Walker stated that because of Ricketts' headaches, which occurred three to four times a day, he required rest. (R. at 92, 284.) Sitting, standing, walking, muscle tension in the neck, and vibrations caused by driving resulted in the onset of headaches. (R. at 92, 225, 284, 290, 293–94.) In turn, the headaches caused blurred vision in his left eye. (R. at 284.)

The ALJ dismissed Ricketts' intense headaches because his shoulder brace had alleviated the pain. (R. at 21.) Ricketts testified, however, the pain lasted "a couple hours, sometimes longer," before reaching even a "tolerable" level. (R. at 284–85.)

The ALJ, in his psychiatric review, found Ricketts merely suffered from situational depression. (R. at 27.) The record is replete, however, with evidence which substantiates a finding of depressive syndrome. For example, Ricketts' description of an average day in the Claimant's Statement [10] suggests anhedonia. According to Ricketts, he usually watched television but sometimes read a little or went back to bed because of his headaches and pain. (R. at 119.) The TOP analysis reported "things go as well as can be expected with his great level of disability," but they "have absolutely no sex life ... and basically ... are just both adjusting to the fact that he is so disabled that he cannot do much of anything." (R. at 228). He "putters" around the house, generally doing nothing and feeling useless. (Id.) Ricketts also testified he had given away his rifles, motorcycle, pool cues and fishing rods and that he abandoned his past interests such as baseball, hiking, camping, playing Frisbee, walking, and even going to the movies or restaurants because of his injury. (R. at 219, 225, 289–90.)

---

**8.** A sympathectomy is "the transection, resection, or other interruption of some portion of the sympathetic nervous pathways." *Dorland's Illustrated Medical Dictionary* 1511 (25th ed.1974).

**9.** "RSD remains enigmatic, in its diagnosis as well as its treatment... cardinal findings support the diagnosis of RDS: *pain out of proportion to initiating trauma, swelling, stiffness, and discolor-*

ation ...." Plaintiff's Opening Brief at 4, n. 8, (citing A. Ladd, K. DeHaven et. al., *Reflex Sympathetic Imbalance; Response to Epidural Blockade,* AMERICAN JOURNAL OF SPORTS MEDICINE, Sept.–Oct.1989, 660)(emphasis added).

**10.** The full document title is "When Request for Hearing is Filed and the Issue is Disability."

The record also contains evidence which establishes an appetite disturbance accompanied by a change in weight, a symptom of depressive syndrome. In 1991, Dr. Polatin referenced his appetite disturbance. (R. at 194.) Dr. Harold Kimmerling mentioned Ricketts' "decreased appetite" in 1992, although he reported no weight loss at that time. (R. at 163.) Attorney Lester Vance's 1993 notes mention a fifteen pound weight gain due to his less active lifestyle. (R. at 130.) Ricketts testified at the hearing that he had not intentionally dieted but had recently lost thirty pounds because he was not hungry. (R. at 290.) This claim was largely substantiated by Dr. Richard Evans, whose September 1994 notes recorded a twenty-two pound weight loss in just two months. (R. at 244.) Ample evidence supports a finding of an appetite disturbance and weight fluctuation.

Sleep disturbance, another symptom of depressive syndrome, is also borne out by the record. Dr. Kimmerling reported Ricketts slept only four to five hours per day because of his "nerves" in 1992. (R. at 163.) Dr. James Evans referred him to a family physician to obtain recommendations regarding sleep in 1994 and again in 1995 because Ricketts was not getting the quality and quantity of sleep necessary. (R. at 238, 213.) By 1995, Ricketts reported to Dr. Evans that he was sleeping only one-and-a-half hours per night. (R. at 213.) In spite of Dr. Evans' comment that most physicians would not be comfortable prescribing Valium on an ongoing basis for sleep, Ricketts began taking it shortly before the hearing. (R. at 213, 286.) Even with Valium, he testified he was still sleeping only an hour-and-a-half to two hours a night, as he had been for almost five years. (R. at 286.)

Ricketts' feelings of guilt and worthlessness are also indicative of a depressive syndrome. The TOP psychological evaluation repeatedly mentioned he "feels useless and unproductive," and generally, "feels worthless much of the time, feels badly that his wife is working, does not feel productive ... feels as if he has lost his entire life because driving a truck was his entire life." (R. at 219–20.) When a TOP examiner asked how the pain affected his life, Ricketts replied: "Take an Olympic athlete and put him in a wheelchair and say that's all you'll ever do. That's how I feel." (R. at 224.) He felt frustrated as a family provider and explained: "My grandfather raised me and he taught me that a man's suppose [sic] to be able to take care of his family .... And I don't feel like much of a man right now." (R. at 288.)

The ALJ denied that Ricketts had any problems concentrating because his claims pertained to difficulty reading for long periods of time without addressing persistence, pace or failure to complete tasks in a timely manner. (R. at 18.) The ALJ's conclusion disregarded Ricketts' testimony that he could not concentrate long enough to work through crossword puzzles or play games and was forced to stop when he attempted those activities. (R. at 294.)

The ALJ discounted Ricketts' thoughts of suicide as evidence of a depressive syndrome because he had not planned or attempted to take his own life. (R. at 27, 18.) Dr. Evans' records, however, noted Ricketts denied suicidal thoughts but admitted to "homicidal ideation in the past." (R. at 232.) At the hearing, Ricketts conceded he had been so depressed that he had considered suicide. (R. at 288.) I conclude the ALJ's finding that Ricketts suffered only from situational depression is overwhelmed by evidence in the record, supporting a finding of depressive syndrome.

Throughout the hearing, the ALJ expressed the need for input from a medical expert (ME). (R. at 274, 296–97.) No ME was present and the ALJ repeatedly suggested a supplemental hearing would be necessary. (R. at 274, 296–97, 299–300.) The ALJ stated, without explanation from an ME, he was unable to understand the connection between Ricketts' shoulder injury and his inability to sit. (R. at 296–97, 299–300.) He nevertheless concluded, "there's no evidence to find that this person cannot sit with the normal breaks ... for a full eight hours," and asked the VE to state the job opportunities available for people who are able to sit. (R. at 303–04, 299.) Ricketts attempted to explain: "Yeah, but see what

I'm saying is I can't sit for a long period of time." (R. at 299.) The ALJ responded: "That's what you told [sic]. That's why I say I need a[sic] ME to tell what a shoulder's got to do with sitting." (R. at 299–300.) The ALJ nonetheless proceeded with the hearing and reached his conclusions without the input of an ME. (R. at 300.)

I find the ALJ failed to consider all of the relevant evidence and failed to develop the record adequately.

### B. *Failure to assess correctly credibility regarding pain*

■ The ALJ determined "[t]he contrast between claimant's allegations of pain and the medical record as well as his admitted activities leads to the conclusion that he is exaggerating the significance of his pain." (R. at 22.) In support of this statement, the ALJ cited the benefit Ricketts experienced from use of a shoulder support, the lack of prescription pain medication other than Valium for sleeping, his failure to complete the TOP program, the ability to walk one-eighth of a mile, sit for forty-five minutes to one hour, lift three pounds and brace things with his left arm and twenty to twenty-five pounds with his right arm, and a variety of Ricketts' daily activities. (R. at 21–22.) As discussed below, these conclusions were not borne out by the record. I therefore find the ALJ's credibility determination, which would normally be given special deference, was overcome by the evidence. *See Williams,* 844 F.2d at 755 (citing *Beavers v. Secretary of Health, Education and Welfare,* 577 F.2d 383, 387 (6th Cir.1978)).

Contrary to the Defendant's assertion that the orthosis apparently relieved Ricketts' pain, his discomfort was not significantly alleviated by use of the shoulder support. He reported wearing his brace seventy-five to eighty percent of the time, yet still rated his level of pain at seven out of ten on average. (R. at 222, 232.) This represents increased use of his brace from 1992 and 1993, when Ricketts wore the support only fifty to sixty percent of the day in accordance with Dr. Walker's instruction. (R. at 92, 113.) His increased reliance on the orthosis contradicts the conclusion that the brace had successfully alleviated his pain.

With regard to the ALJ's statement regarding lack of prescription pain medication, Ricketts' attorney attempted to explain that pain medication might not be effective because the injury involved a damaged nerve. (R. at 300.) The ALJ's only response was, "but he doesn't take anything." (*Id.*) Ricketts testified, however, that he took ten to twelve or fourteen Advil on an average day without relief in addition to Prozac and Valium. (R. at 204, 298, 300.)

The ALJ did not take into account that a "claimant may have reasons other than lack of impairment for not seeking or taking medication." *See Williams,* 844 F.2d at 756 (citing *Lovejoy v. Heckler,* 790 F.2d 1114, 1117 (4th Cir.1986)). Testimony established that failure to find relief from prescription pain medications, side effects, his allergy to codeine, and monetary concerns prevented Ricketts from taking additional prescription medications. (R. at 138–40, 188, 218–19, 268, 286, 298–99, 130, 149, 161, 194, 229, 228, 239.) However, because Ricketts was not taking prescription medication at the time of the hearing, the ALJ diminished the significance of his pain. He concluded the medical records did not substantiate Ricketts' claims regarding his pain, in part because, "[h]e is taking only over-the-counter Advil ... and takes generic Valium at night for sleeping." (R. at 21.) This was despite the ALJ's acknowledgement, "you're never free from pain, I heard that, all day long .... The pain medication does not relieve you." (R. at 298.)

Ricketts' failure to continue taking prescription pain medication is not indicative of failure to seek relief from his pain. In *Williams,* the claimant "repeatedly sought medical relief from pain" and underwent surgery twice for that purpose. *Williams,* 844 F.2d at 756. Similarly, Ricketts pursued relief from pain by taking a variety of prescription medications following his injury and enduring three surgeries because of his continuing complaints of pain. (R. at 118, 136, 139–40, 145, 159, 160–61, 175, 180, 183, 185, 189, 194, 195, 197, 205, 210, 217, 229, 233, 244, 259, 265–70, 147, 160, 170.) In

addition to Advil, he used a shoulder support, a heating pad which frequently burned his numb skin, ice, a TENS unit, bio-feedback, a brain synchronizer, lying down, electrical stimulation, massage and manipulation, and marijuana as well as attempting to obtain insurance approval for both the P.R.I.D.E. and TOP programs. (R. at 294–95, 222, 287, 244, 284, 229–30, 217, 234.)

Defendant argues the record supports the ALJ's finding that Ricketts lacked credibility regarding the severity of his pain. He cites physician notes from October 1990 through August 21, 1991, noting improvements in Ricketts' condition and physician findings that his shoulder was clinically intact. (R. at 159, 188, 186, 184.) Defendant dismisses Dr. Polatin's determination that Ricketts was "chronically disabled," arguing he was not a treating physician and therefore his opinion is not entitled to substantial weight. *See Sorenson v. Bowen,* 888 F.2d 706, 711 (10th Cir.1989). Defendant nonetheless admits Dr. Williamson referred Ricketts to Dr. Polatin because of his continued complaints of pain and that Dr. Polatin's objective findings were consistent with the findings of Drs. Thomas, Patman, and Williamson.

■ The ALJ found Ricketts' daily activities contradicted his allegations of pain. In support of this finding, the ALJ referred only to Ricketts' ability to watch television, walk his dogs, drive, warm food in the microwave and prepare a sandwich, and to vacuum on occasion. (R. at 22.) These activities do not, however, contradict a claim of disabling pain, as the "sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity." *See Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir.1993)(citing *Frey v. Bowen,* 816 F.2d at 516–17).

With reference to Ricketts' failure to complete the TOP program, ample evidence in the record suggests that whatever reason Ricketts had for discharging himself was unrelated to a lack of motivation for improvement or insignificant levels of pain. According to Dr. Evans, both Ricketts and his wife "were quite eager to pursue that approach." (R. at 233.) On January 11, 1994, Ricketts gave Dr. Evans permission to communicate with Dr. Urschel and his insurance carrier regarding TOP. (R. at 234.) Dr. Evans pursued the TOP alternative and noted the pain program staff considered Ricketts an excellent candidate. (R. at 235.) He also noted Ricketts and his wife were "very positive about the pain program." (*Id.*) A line in Dr. Evans' records from that date stated that he would "await authorization from the carrier." (*Id.*)

On February 7, 1994, Dr. Evans saw Ricketts again and wrote, "I think he is quite anxious to get authorization to get into the hospital. I called the hospital, but was not able to talk with Ms. Hayes or Leann. I will try to follow through to make sure that everything is going smoothly in getting authorization." (R. at 236.) Another reference to the need for insurance authorization appears on February 21, 1994. (R. at 238.) In May, Dr. Evans' records stated: "Again, I have encouraged him to get back to see Dr. Tyler [with TOP]. *Bill was concerned about his coverage,* but I think he knows that this is an option . . . ." (R. at 239)(emphasis added). No further notations indicate whether approval for the pain program was given by the insurance carrier, but the TOP report noted that "money is definitely a problem." (R. at 228.)

By the time Ricketts was admitted to TOP in March, 1994, he had increased the use of his brace to seventy-five to eighty percent of the time, reporting pain of seven out of ten on average, three-and-a-half out of ten at best, and nine out of ten at worst. (R. at 214, 222, 232.) His symptoms included poor circulation, pain from fingertips to ear, headaches, stabbing pain, aches, burning, and a pins and needles sensation in his left arm and shoulder. (R. at 222.) His muscle atrophy had greatly increased and TOP examiners described it as, "marked wasting of the middle deltoid, upper superior trapezii, levator scapulae, with depression of the entire posterior shoulder girdle complex as compared to the right." (R. at 219.) Ricketts' activities were limited as a result of his chronic pain, interfering with his ability to sit, stand, walk, lift, reach, lie down, drive, manage self-care tasks, and handle homemaking responsibilities. (R. at 225.) One of the TOP examiners

commented on his motivation for change, noting he was "at the end of his rope," and that "he will do anything to better this situation which is really not like living according to him." (R. at 221.)

■ Denial of benefits is appropriate when a claimant refuses to follow prescribed treatment without good reason if the treatment could restore his ability to work. *See Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990). Rather than considering possible reasons in the record for Ricketts' departure from the program, however, the ALJ merely took note of his discharge. (R. at 22.) I conclude the ALJ lacked substantial evidence for his credibility assessment.

### C. *Failure to address findings of total disability*

■ A physician's finding of total disability is not binding upon the ALJ's decision. *See Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir.1988). Although not binding, the ALJ should have considered such findings.

Dr. Polatin referred to Ricketts as "chronically disabled $ temporarily totally disabled." (R. at 195.) The Defendant states Dr. Polatin was not a treating physician and therefore his opinion was not entitled to substantial weight. Dr. Walker described Ricketts as "unable to perform the usual tasks of a worker to such extent that he can get and keep regular employment." (R. at 131.) The Defendant dismisses this information because it was solicited by an attorney, was a legal conclusion instead of a medical one, and was not accompanied by further explanation, allowing the ALJ to question the physician's credibility. *See Lewis v. Schweiker*, 720 F.2d 487, 489 (8th Cir.1983); *Bernal*, 851 F.2d at 299; *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir.1984). The TOP assessment described Ricketts as "totally disabled," and Dr. Evans said he was "quite dysfunctional regarding the pain." (R. at 221, 237.)

The failure to discuss certain evidence does not dictate reversal as long as the ALJ explains why "significant probative evidence has been rejected." *Vincent*, 739 F.2d at 1394–95 (quoting *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir.1981)). The ALJ, however did not address any of the physician's findings regarding Ricketts' disability. This was a further failure to develop the record. The weight of the evidence, as reflected in multiple findings of disability by Ricketts' treating and examining physicians, suggests the ALJ abused his discretion by showing the reasoning behind his decision but not considering all the relevant factors. *See Olenhouse v. Commodity Credit Corporation*, 42 F.3d 1560, 1574 (10th Cir.1994).

### D. *Error in reliance upon the vocational expert's testimony*

■ Ricketts argues the hypothetical posed to the VE was faulty because it assigned an RFC which included the ability to perform light and sedentary work. In the absence of evidence upon which to make a finding as to RFC, the ALJ should order a consultative examination to determine the claimant's capabilities. *See Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir.1993). Here, the ALJ included sitting in the RFC because he determined "there's no evidence to find that this person cannot sit with the normal breaks in the morning and all the breaks in the afternoon and the lunch break, can work—sit for a full eight hours." (R. at 303–04.)

The Tenth Circuit has noted: "The ALJ's reliance on an omission effectively shifts the burden back to the claimant. It is not her burden, however, to prove she cannot work at any level lower than her past relevant work; it is the [Commissioner]'s burden to prove that she can." *Thompson*, 987 F.2d at 1491. Rather than ordering a consultative examination to establish evidence regarding Ricketts' ability to sit, the ALJ decided to proceed with the hearing. (R. at 300.)

The ALJ's hypothetical did not accurately include all of the limitations established in the record. *See Hargis*, 945 F.2d at 1492. Dr. Larson said Ricketts had "almost a useless left arm," and Dr. Walker found, "he no longer has use of his left shoulder." (R. at 242, 126.) Ricketts testified he was not to lift more than three pounds with his left arm, yet for purposes of the hypothetical the ALJ

suggested he could lift more if enforced with his right hand. (R. at 294, 303.)

Ricketts also claims the hypothetical failed to include reference to pain. Whether the hypothetical in fact included pain is unclear. The ALJ's instruction to the VE was ambiguous, stating: "And with that regard, any pain that you've heard for the purpose of this hypothetical, if you've been here, is basically any light or sedentary type job that just—if you could find one without—with the limitations on that left upper extremity." (R. at 304.)

Ricketts' attorney asked the VE whether any of her recommended jobs would allow a person who had a pain problem to take breaks at will, for as long as an hour. (R. at 305.) The VE's response was negative, noting "there is not an option in the work place to take an hour break at will." (*Id.*) The VE's statements demonstrate that pain was not considered as part of the hypothetical regardless of whether the ALJ intended its inclusion. Defendant's own description of the hypothetical, in fact, omits any reference to pain.

The federal regulations which guide the determination of RFC specifically mention pain, and *Williams* includes pain as a nonexertional limitation. 20 C.F.R. § 404.1545; 844 F.2d at 752 (citing *Channel v. Heckler*, 747 F.2d 577, 580 (10th Cir.1984)). To the contrary, the ALJ found no nonexertional limitations. (R. at 24.) This further indicates the ALJ did not intend the VE to include pain in her assessment, producing a flawed hypothetical.

The ALJ's findings regarding Ricketts' inability to sit for purposes of the hypothetical are also unclear. He first concluded shoulder pain did not prevent Ricketts from sitting a full eight hours, yet stated in his decision that Ricketts could sit "for about an hour." (R. at 303–04, 21.)

Ricketts argues additional omissions in the hypothetical which would have a bearing on his RFC included the failure to mention a lack of bilateral manual dexterity, the inability to work above shoulder level on the left, and the inability to work around people.

The assertion that the ALJ ignored his incapacity for bilateral manual dexterity and work above shoulder level on the left is imprecise. Ricketts testified he is left-handed but learned to write with his right hand in parochial school and is able to write now. (R. at 278, 276.) When responding to the hypothetical, the VE noted, "learning to write with the right hand would give him functional use of a non-dominant hand." (R. at 304.)

There was no discussion, however, of Ricketts' Dupuytren's contracture,[11] for which he had surgery on the right hand sometime between 1984 and 1988. (R. at 110, 130, 161, 164.) In fact, the June 9, 1993 state agency Residual Physical Functional Capacity Assessment by M.C. Schlecte, M.D. listed manipulative limitations for both Ricketts' right and left hands. (R. at 71.) Dr. Schlecte found Ricketts' left hand was limited for reaching all directions (including overhead), handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors), while only marking Ricketts' abilities with his right hand "unlimited" for reaching all directions and feeling. (R. at 71.) Dr. Schlecte gave no indication of Ricketts' limitations for gross and fine manipulation with his right hand. (*Id.*)

Although the ALJ did not specifically state Ricketts was unable to work above shoulder level on his left, his instructions to the VE effectively encompassed that limitation by specifying "just call that left arm dysfunctional ... really don't use [it] except for ... steadying or so forth." (R. at 303.)

The ALJ acknowledged Ricketts avoided people "because he really does not like them," and chose trucking as a profession because he preferred being alone. (R. at 18.) In Ricketts' own words, he didn't "play and work well with other people" because he "can't put up with people's attitudes." (R. at

11. Contracture is "a condition of fixed high resistance to passive stretch of a muscle, resulting from fibrosis of the tissues supporting the muscles or the joints, or from disorders of the muscle fibers"; Dupuytren's contracture is "shortening, thickening, and fibrosis of the palmar fascia, producing a flexion deformity of a finger; sometimes associated with long-standing epilepsy." *Dorland's Illustrated Medical Dictionary* 355 (25th ed.1974).

220, 292.) This problem affected his relationship with authority figures as well. Ricketts stated: "If somebody does something I don't like, I'll tell them about it, whether it's my boss or whoever it is . . . ." (R. at 292.) The ALJ stated Ricketts interacted and functioned socially around people, but failed to note Ricketts had withdrawn so much he basically only interacted with his wife. (R. at 18, 221.) A TOP examiner suggested Ricketts needed treatment for his depression, education regarding stress management and the psychological factors associated with chronic pain, and improvement in communication and interpersonal skills in relationships. (R. at 221.) This mirrors Dr. Evans' concerns regarding Ricketts' depression. (R. at 213, 232.) The ALJ, however, did not include any mental impairments in the hypothetical and instead decided:

> [H]is daily activities are not restricted by his alleged depression[;] his mental impairment is no more than a slight abnormality having such minimal effect on his ability to work, that considered alone and in combination with his severe impairments, it would not be expected to interfere with his capacity for work . . . .

(R. at 19.) I conclude the VE's opinion was not based upon a consideration of significant evidence in the record.

■ Ricketts maintains, in addition to creating a flawed hypothetical, the ALJ's reliance upon jobs suggested by the VE was unjustified. The VE suggested four jobs, namely, order clerk for food and beverage in the hotel industry, order caller in a merchandise distribution center, usher, and information provider in a transportation center. (R. at 22–23.)

Both light and sedentary jobs require the ability to sit, stand and walk. 20 C.F.R. § 404.1567(a); 20 C.F.R. § 404.1567(b). Ricketts also noted that, "most jobs identified . . . require the personal trait of dealing with people and all but the usher job require frequent reaching and handling." (Plaintiff's Opening Brief at 9, n. 21.) I agree and find the VE's suggested jobs incompatible with Ricketts' limitations on his ability to sit, stand, walk, and reach with his left arm.

### E. Failure to consider the entire period of disability

Ricketts asserts the ALJ based his decision on the conclusion that the third surgery relieved his symptoms whereas he should have considered the entire record, including the period before the operations. He argues the ALJ relied upon post-operative periods of improvement that soon showed reoccurrence of RSD or preceded new diagnoses. This assertion is unsupported by the ALJ's decision, which acknowledged Ricketts' surgeries were unsuccessful in restoring the use of his left arm. (R. at 19.) The ALJ's presentation of the facts mentioned both his improvements and recurring pain, although he discounted the significance of the pain. (R. at 20–21.) I find Ricketts' argument in this regard is without merit.

### F. Inaccurate standard of "all work activity"

■ The ALJ found the credible evidence did not suggest an underlying condition that would preclude "all work activity." (R. at 24.) The appropriate standard, however, is one of "substantial gainful activity," which is described as, "performance of substantial services with reasonable regularity . . . . Ability to . . . do some work on an intermittent basis does not necessarily establish that a person is able to engage in a 'substantial gainful activity . . . .'" *Jozefowicz v. Heckler*, 811 F.2d 1352, 1356 (10th Cir.1987)(quoting *Markham v. Califano*, 601 F.2d 533, 534 (10th Cir.1979)). "The ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find and hold a job in the real world." *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir.1984).

Whether Ricketts' injuries precluded him from all work activity is not identical to whether he was able to find and hold a job, performing services with reasonable regularity. *Parsons* noted employers' concern with "substantial capacity, psychological stability, and steady attendance," and their reticence to hire a person with serious physical or mental problems. (*Id.*) (citing *Thomas v. Celebrezze*, 331 F.2d 541, 546 (4th Cir.1964)). I determine the ALJ's "all work activity"

standard was incorrect in that he failed to assess Ricketts' capacity for "substantial gainful activity" in making the disability determination.

### G. *Incorrect substitution of personal opinion for that of professionals*

The ALJ concluded Ricketts did not have a severe mental impairment, (R. at 18–19), and found only that Ricketts suffered from situational depression. (R. at 27.) "To meet Listing 12.04 in the Listing of Impairments, claimant must have a depressive syndrome characterized by four of the listed symptoms." (R. at 18.)

As already established, evidence in the record suggests a depressive syndrome, supported by findings of anhedonia, appetite disturbance with change in weight, sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide.[12] The ALJ, however, failed to make similar findings. (R. at 26–27.)

The ALJ concluded Ricketts' weight only fluctuated five pounds between 1990 and 1994 and found no significant weight change. (R. at 18.) The record supports a contrary conclusion. It shows a fifteen pound increase because Ricketts was less active, followed by stable weight at 147 pounds on October 15, 1990. (R. at 130, 160.) Ricketts, however, later admitted an appetite disturbance to Dr. Polatin on August 21, 1991 and to Dr. Kimmerling on March 16, 1992. (R. at 194, 163.) Dr. Richard Evans' September 9, 1994 report reflects a twenty-two pound weight loss in two months. (R. at 244.) This 1994 report, made just five days before the hearing, records Ricketts' weight at 142 pounds and is the basis for the ALJ's conclusion that Ricketts' weight did not fluctuate over five pounds. (R. at 18.) The ALJ, however, did not refer to Dr. Evans' note on the very same page which mentioned the twenty-two pound weight loss. (R. at 244.)

The ALJ also dismissed Ricketts' sleep disturbance because he had taken generic Valium and "testified that with the help of this medication he was sleeping a lot better and was able to sleep for longer periods at a time." (R. at 18.) Ricketts' testified that his improved sleep pertained to the first time he took the Valium; his earlier testimony at the hearing established he took Valium for sleep and yet still slept only about an hour-and-a-half to two hours a night. (R. at 295, 286.)

The ALJ recognized Ricketts' feelings of worthlessness because of his inability to support his family and acknowledged that he had considered suicide, but dismissed both because Ricketts had never attempted suicide and did not have a plan to do so. (R. at 18.)

Finally, the ALJ did not find Ricketts had difficulty concentrating or thinking because it pertained to reading for "long periods of time" and did not address persistence, pace, or failure to complete tasks in a timely manner. (*Id.*) In fact, Ricketts was able to read and build models for only a "few minutes" because of pain—hardly a "long period" of time. (R. at 122–23.) He testified he and his wife used to work puzzles regularly, but he was no longer able to concentrate enough to do so although he had tried and was forced to stop. (R. at 294.)

The ALJ determined Ricketts was "frustrated and depressed" because he lacked full use of his left shoulder and arm, would eventually lose the arm, and nothing further could be done to help him. (R. at 18.) Nonetheless, he decided Ricketts' limitations in "normal day-to-day tasks are a result of not having full use of his left arm rather than being caused by a mental impairment." (*Id.*) The ALJ found his mental impairment had only a minimal effect on his ability to work because he found no evidence in the record that Ricketts had received any psychiatric treatment and his daily activities were not restricted by his depression. (R. at 19.) Once again, however, the ALJ's conclusions were not supported by the record.

12. There is evidence of; anhedonia (R. at 119, 228, 290); appetite disturbance with change in weight (R. at 163, 244, 194); sleep disturbance (R. at 163, 213, 238, 213, 286, 213); feelings of guilt or worthlessness (R. at 219–20, 224, 288); difficulty concentrating or thinking, (R. at 294, 122–23), limited ability to read, build models because of pain; thoughts of suicide (R at 288, 232).

Psychological assessments and evidence in the record reflected Ricketts' virtually complete withdrawal from social interaction. (R. at 123, 219, 225, 289–91.) The TOP psychological examiner stated that Ricketts' profile described a person in a "good deal" of psychological distress, who did not fit in with his environment, who was nonconforming and resentful of authority, and who was angry, irritable, and hostile. (R. at 18, 123, 220–21.) The examiner found that these factors, in combination with his depression, worsened Ricketts' chronic pain syndrome. (R. at 220.) This analysis was not part of the ALJ's consideration, nor did he consider that Dr. James Evans, who referred Ricketts to TOP, was also a psychologist. (R. at 233.) His determination that there was no evidence of psychiatric treatment in the record was erroneous.

## V. CONCLUSION

I conclude the ALJ failed to consider the evidence, develop the record, correctly assess Ricketts' credibility, and address findings of total disability. In addition, he posed an incomplete hypothetical to the VE and incorrectly relied upon the VE's testimony. The ALJ also used an improper standard of "all work activity," and ignored findings of the psychological examiners. The record more than amply supports an award of benefits. No useful purpose would be served by a remand for further consideration. The final decision of the Defendant is reversed. Plaintiff is awarded benefits, costs and attorney fees.